AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Information associated with Facebook<br>User ID #100035429260898 that is stored<br>at premises controlled by Meta Platforms, Inc. | Case No. '22 MJ1667 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Northern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 2244 | Abusive Sexual Contact |

The application is based on these facts:
See Attached Affidavit of Special Agent, incorporated herein by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Sean Kelly, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: 05/12/2022

*Judge's signature*

City and state: San Diego, California    Hon. Barbara L. Major, United States Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Sean Kelly, upon being duly sworn do hereby state that the following is true to my knowledge and belief:

**INTRODUCTION**

1. I am a special Agent of the Federal Bureau of Investigation and have been so employed since September 2017. I am currently assigned as the Maritime Liaison for the San Diego Division. My responsibilities include investigating crimes within the special maritime jurisdiction of the United States and crimes occurring within the maritime environment, where the FBI maintains jurisdiction. Prior to my current role, I was assigned to the North County Regional Gang Task Force where I received formal training and gained experience in narcotics and gang investigations. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, undercover operations, mail covers, telephone toll analysis, and search warrants.

2. This affidavit is made in support of an application for a warrant Facebook user account (**Target Account**):

   paul.thewanderer
   User ID# 100035429260898

This account is stored at the premises owned, maintained, controlled, or operated by Meta Platforms, Inc., 1601 Willow Road, Menlo Park, California 94025, more fully described in Attachment A. Meta Platforms, Inc. was formerly known as Facebook, Inc. Meta Platforms still supports the social media program Facebook, which is discussed in more detail below.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence exists within the **Target**

**Account** related to violations of federal law, including violations of 18 U.S.C. § 2244 as further described in Attachment B.

4. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

## BACKGROUND ON FACEBOOK

5. Meta Platforms, Inc. owns and operates a free-access social networking website named Facebook that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users and sometimes with the general public.

6. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

7. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.

Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

8. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

9. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.

10. Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages,

1  attachments, and links that will typically be visible to anyone who can view the
2  user's profile.

3      11.    Facebook allows users to upload photos and videos, which may include
4  any metadata such as location that the user transmitted when he or she uploaded the
5  photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook
6  users in a photo or video. When a user is tagged in a photo or video, he or she
7  receives a notification of the tag and a link to see the photo or video. For Facebook's
8  purposes, the photos and videos associated with a user's account will include all
9  photos and videos uploaded by that user that have not been deleted, as well as all
10 photos and videos uploaded by any user that have that user tagged in them.

11     12.    Facebook users can exchange private messages on Facebook with other
12 users. These messages, which are like e-mail messages, are sent to the recipient's
13 "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as
14 well as other information. Facebook users can also post comments on the Facebook
15 profiles of other users or on their own profiles; such comments are typically
16 associated with a specific posting or item on the profile. In addition, Facebook has
17 a chat feature that allows users to send and receive instant messages through
18 Facebook. These chat communications are stored in the chat history for the account.
19 Facebook also has Video and Voice Calling features, and although Facebook may
20 not record the calls themselves, it does keep records of the date of each call.

21     13.    If a Facebook user does not want to interact with another user on
22 Facebook, the first user can "block" the second user from seeing his or her account.

23     14.    Facebook has a "like" feature that allows users to give positive
24 feedback or connect to particular pages. Facebook users can "like" Facebook posts
25 or updates, as well as webpages or content on third-party (i.e., non-Facebook)
26 websites. Facebook users can also become "fans" of particular Facebook pages.

27

15. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

16. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

17. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs (i.e., blogs), or to import their blogs from other services.

18. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

19. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

20. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications (apps) on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

21. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following

information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

22. Facebook also retains Internet Protocol (IP) logs for a given user ID. These logs may contain information about the actions taken by the user ID or IP address[1] on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile and would show when and from what IP address the user did so.

23. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank

---

[1] An Internet Protocol address or "IP address," is expressed as four groups of numbers separated by decimal points and/or eight groups of numbers separated by colons and is unique to a particular subscriber account during an online session. The IP address provides a unique location making it possible for data to be transferred between computers. IP addresses can be dynamic, meaning that the ISP assigns a different number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. Internet companies such as Facebook, typically log the IP address used by its subscribers to access their services. These logs are available to law enforcement using appropriate legal process.

account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user because of the communications.

24. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into

some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information to conceal evidence from law enforcement).

25. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**FACTS SUPPORTING PROBABLE CAUSE**

26. On October 31, 2021, the FBI's San Diego field office received a report from the Holland America Group (HAL) alleging that late in the evening on October 23, 2021, PAUL MANDACHE (MANDACHE), a citizen of Romania had sexually assaulted Karen Brucker (Brucker), a citizen of the United States, while onboard the Holland America Lines (HAL) cruise ship Motor Vessel (M/V) KONINGDAM in international waters.

27. On or about October 29, 2021, after spending approximately six days attempting to report the sexual assault to the designated HAL representative onboard, Brucker formally reported the incident to the Human Resources Manager onboard the M/V KONINGDAM. Immediately following receipt of the report, HAL initiated an investigation and reported the incident to the FBI per HAL's policy.

8

1  Once the M/V KONINGAM docked in San Diego, California, in the Southern
2  District of California, I began my investigation.

3      28. On or about November 4, 2021, HAL provided me with written statements from both Brucker and MANDACHE, as well as transcripts from a Facebook conversation between Brucker and MANDACHE discussing the events that took place on the evening of October 23. MANDACHE was using the **Target Account** to communicate with Brucker.

    29. On or about November 7, 2021, a Naval Criminal Investigative Service (NCIS) Task Force Officer (TFO) and I interviewed Brucker onboard the M/V KONINGDAM while in port in San Diego. Brucker confirmed that she allowed MANDACHE to come over to her cabin, A051, on the evening of October 23, because of his request. After MANDACHE's arrival in her cabin, the two consensually engaged in an oral sex act. Leading up to the oral sex act, Brucker did not observe MANDACHE to be impaired or intoxicated. Upon completion of the oral sex act, MANDACHE asked to stay the night in Brucker's bed. Brucker agreed but insisted that they would not be having any sexual intercourse.

    30. MANDACHE and Brucker proceeded into bed together, with Brucker lying closest to the wall. MANDACHE began touching her chest under her clothing. MANDACHE, who was lying behind Brucker and facing her, attempted to pull down her shorts. Brucker believed that MANDACHE was attempting to engage in a sex act and felt MANDACHE's penis attempting to penetrate her. She tightened her glute muscles to prevent penetration and immediately told MANDACHE to "STOP." MANDACHE did not verbally respond and continued to attempt to pull down her shorts. Brucker confirmed that the touching was skin on skin. MANDACHE attempted to engage in sex approximately 3-6 times and each time Brucker requested that he stop.

31. Shortly thereafter, Brucker believed that MANDACHE might have been masturbating next to her. Eventually he stood up, used her personal bathroom, and then departed the room at approximately 3:30 AM the following day (October 24).

32. A review of the Facebook transcripts provided by HAL, which are noted to be from October 24, identified the following Facebook message between Brucker and MANDACHE (who was using the **Target Account**):

MANDACHE: *Good Morning Sunshine.*

BRUCKER: *I don't think I was [want] to hang out anymore. Last night made me very uncomfortable. I kept telling you no and you wouldn't listen to me. I felt very disrespected when you kept pushing for sex when I told you from the beginning, I didn't want to. The [then] I woke to you trying to force me to have sex with you. I felt very trapped with nowhere to run.*

MANDACHE: *I'm sorry u feel that – that's why I left as well – and asked if you want me to go – I never forced you… sorry if u felt that… that's why I left – if you don't want me to hang out anymore I can understand that… I don't agree but I understand it – since you did not say anything that u want me to go or something else… I did it anyway… that's why I left as well – I just gave you a kiss and left… u did not mention anything – that's why I said now good morning and wanted to ask you if you want coffee…*

| | | |
|---|---|---|
| 1 | | *but you wake up upset already – and I care about* |
| 2 | | *you -wheter [whether] u believe or nor* |
| 3 | BRUCKER: | *I feel like you need to learn when a girl says no she* |
| 4 | | *means it. Don't try to force her to have sex with you.* |
| 5 | | *I kept pulling up my pants and saying no like 20* |
| 6 | | *times. Yes I said you could stay if you behaved, then* |
| 7 | | *I wake up to you trying to force me to do something* |
| 8 | | *I didn't want to. That is really what made me* |
| 9 | | *uncomfortable. That makes it super hard to trust* |
| 10 | | *you again.* |
| 11 | MANDACHE: | *I understand, I'm really sorry to make you feel* |
| 12 | | *uncomfortable.. I misunderstood the signals ..but if* |
| 13 | | *u give me a chance… I can show you that you can* |
| 14 | | *trust me… and if again its happen this… then I* |
| 15 | | *understand if u never want to talk to mr – me – u* |
| 16 | | *said super hard to trust…which means there is still* |
| 17 | | *some hope… and I want to hang out [on] to that* |
| 18 | | *hope – that's why I was honest with you – can I get* |
| 19 | | *you a coffee? Or somethings* |
| 20 | BRUCKER: | *Right now it's a no. I really don't feel like I can trust* |
| 21 | | *you or that you respect me. I'm not letting you back* |
| 22 | | *into my cabin until you earn my trust back – No I'm* |
| 23 | | *getting off the ship and I don't drink coffee.* |
| 24 | MANDACHE: | *How about tea? – ok I understand and I respect that* |
| 25 | | *– but thanks for giving me the chance to make it* |
| 26 | | *right – l am in the Lido now and still open.. if u* |
| 27 | | |

|   |   |   |
|---|---|---|
| | | *wanna grab something let me know… not enter…* |
| | | *just drop… let me know* |
| | BRUCKER: | *I don't need anything. Thanks* |
| | MANDACHE: | *Ok.. in case you change your mind. Let me know –* |
| | | *have a good time outside – I was a jerk… I know…* |
| | | *sorry one more time – just wanna say this… when I* |
| | | *left… if I did not care about you… I would not have* |
| | | *kissed you 10 times then go… or to ignore you… like* |
| | | *others do… that's all I wanted to say.* |
| | BRUCKER: | *Thank you for the apology* |

33. Based on the foregoing, I respectfully submit that there is probable cause to believe that MANDACHE committed the violation of 18 U.S.C. § 2244, and there is probable cause to believe that obtaining the contents of the **Target Account** would identify MANDACHE communicating about the sexual act to the victim or to others.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

34. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Meta Platforms, Inc. are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Mata Platforms and Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Meta Platforms. The impact on Meta Platforms' business would be disruptive and severe.

35. Therefore, I request authority to seize all content from the **Target Account** as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Meta

Platforms, to protect the privacy of Facebook's subscribers whose accounts are not authorized to be searched, and to effectively pursue this investigation, authorization is sought to allow Meta Platforms to make digital copies of the entire contents of the account subject to seizure. The copies will be provided to me or to any authorized federal agent. The copies will be imaged, and the images will then be analyzed to identify communications and other electronic records subject to seizure pursuant to Attachment B. Relevant electronic records will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

36. Analyzing the data to be provided by Meta Platforms may require special technical skills, equipment, and software. It may also be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Keyword searches do not capture misspelled words, reveal the use of coded language, or account for slang. Keyword searches are further limited when electronic records are in or use foreign languages. Certain file formats also do not lend themselves to keyword searches. Many common electronic mail, database, and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. Instead, such data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically. Meta Platforms does not always organize the electronic files they provide chronologically, which makes review even more time consuming and may also require the examiner to review each page or record for responsive material.

37. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data

analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained and, depending on the organization, format, and language of the records provided by Meta Platforms, examiners may need to review each record to determine if it is responsive to Attachment B. The personnel conducting the examination will complete the analysis within ninety (90) days of receipt of the data from the service provider, absent further application to this Court.

38. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all communications that identify any users of the subject account and any communications sent or received in temporal proximity to incriminating communications that provide context to the incriminating communications.

39. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## PROCEDURES TO PROTECT THIRD PARTY PRIVACY

40. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant. If the personnel lawfully conducting the analysis identify information pertaining to crimes outside the scope of the warrant, such information will not be used in any way except to obtain a new warrant authorizing a search for such information. In the event a new warrant is obtained, the government may make use of the data seized in any lawful manner. Absent a new warrant, the personnel conducting the analysis may continue to search and seize data only within the scope of this warrant.

## PRIOR ATTEMPTS TO OBTAIN DATA

41. Other than as stated above, the United States has not attempted to obtain this data by other means.

## GENUINE RISKS OF DESTRUCTION

42. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, a preservation letter was sent to Facebook on or about April 19, 2022, for preservation of the **Target Account**.

## CONCLUSION

43. Based on the foregoing, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of a violation of 18 U.S.C. § 2244, as described in Attachment B, are likely to be found in the property to be searched, as described in Attachment A.



_____
Sean Kelly, Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 12th day of May, 2022.

_____
HONORABLE BARBARA L. MAJOR
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A
## ITEMS TO BE SEARCHED

This warrant applies to information associated with the following Facebook user account, **Target Account**:

       paul.thewanderer

       User ID# 100035429260898

The **Target Account** is currently stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered at 1601 Willow Road, Menlo Park, California 94025.

# ATTACHMENT B

I. <u>Service of Warrant</u>

The officer executing the warrant shall permit Meta Platforms, Inc., as custodian of the computer files described in Section II below, to locate the files relevant to attachment A and copy them onto removable electronic storage media and deliver the same to the officer or agent.

II. <u>Information to be disclosed by Meta Platforms, Inc.</u>

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta Platforms, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Meta Platforms, Inc., or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta Platforms, Inc. is required to disclose the following information to the government for each account listed in Attachment A:

All identity and contact information, including full name, e-mail address, physical address (including city, state, and zip code), date of birth, phone numbers, gender, hometown, occupation, and other personal identifiers;

All past and current usernames associated with the account;

All activity logs including IP logs and other documents showing the IP address, date, and time of each login to the account, as well as any other log file information;

All information regarding the particular device or devices used to login to or access the account, including all device identifier information or cookie information, including all information about the particular device or devices used to access the account and the date and time of those accesses;

All data and information associated with the profile page, including photographs, videos, "bios," and profile backgrounds and themes;

All communications or other messages sent or received by the account;

All user content created, uploaded, or shared by the account, including any comments made by the account on photographs or other content;

All photographs, images, and video in the user gallery for the account including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

All location data associated with the account, including geotags;

All data and information that has been deleted by the user; and

A list of all users that the account has "unfollowed" or blocked.

III.    Information to be seized by the government

The search of the data supplied by Meta Platforms, Inc. pursuant to this warrant will be conducted by the FBI or other law enforcement agent as provided in the "Procedures for Electronically Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of **October 23, 2021 to the present**, and to the seizure of:

a.    Communications, records, and attachments tending to discuss any sexual act with Karen Brucker;

b.    Electronic mail, text or instant messages, posts, profiles information, and attachments tending to discuss any sexual act with Karen Brucker;

c.    Communications, records, and attachments tending to identify Paul Mandache as the individual responsible for the sexual assault of Karen Brucker; and

d.    Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject account;

**which are evidence of violations of 18 U.S.C. § 2244.**